UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE LEDESMA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ADAME, et al.,<br><br>　　　　Defendants. | 1:13-cv-01227-AWI-EPG-PC<br><br>SCREENING ORDER<br><br>FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT ALL REMAINING CLAIMS AND DEFENDANTS BE DISMISSED WITH PREJUDICE<br>(ECF NO. 23) |

　　　　Jose Ledesma ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983.

　　　　On September 15, 2016, the Court granted Plaintiff leave to file his Third Amended Complaint. (ECF No. 22). On that same day the Third Amended Complaint was filed. (ECF No. 23). The Third Amended Complaint is now before the Court for screening.

　　　　Pursuant to an order that will be entered concurrently with these findings and recommendations, the Court has found that Plaintiff has stated a claim against defendants Adame, Tyree, and Lundy for violations of the Eighth Amendment based on conditions of confinement, against defendants Adame and Lundy for inadequate health care in violation of the Eighth Amendment, and against defendants Adame, Tyree, and Lundy for retaliation in violation of the First Amendment. The Court has issued service of Plaintiff's Third Amended Complaint to go forward on those claims.

As Plaintiff has failed to state any other claims, or claims against any other defendants, the Court is now recommending that all other claims and defendants be dismissed from this case.  Thus, this order only addresses the claims and defendants that the Court is recommending be dismissed.

## I.     SCREENING REQUIREMENT

The court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity.  28 U.S.C. § 1915A(a).  The court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b)(1),(2).  "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action or appeal fails to state a claim upon which relief may be granted."  28 U.S.C. § 1915(e)(2)(B)(ii).

A complaint is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."  Fed. R. Civ. P. 8(a)(2).  Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007)).  While a plaintiff's allegations are taken as true, courts "are not required to indulge unwarranted inferences."  Doe I v. Wal-Mart Stores, Inc., 572 F.3d 677, 681 (9th Cir. 2009) (internal quotation marks and citation omitted).  Plaintiff must set forth "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Iqbal 556 U.S. at 678 (internal quotation marks and citation omitted).  While factual allegations are accepted as true, legal conclusions are not.  Id.  The mere possibility of misconduct falls short of meeting this plausibility standard.  Id. at 678-79; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009).

\\\

\\\

## II.     SUMMARY OF THIRD AMENDED COMPLANT

In February of 2011, Plaintiff was subject to a gang validation investigation by members of the California Department of Corrections and Rehabilitation ("CDCR")'s Institutional Gang Investigation Unit ("IGIU")[1] assigned to the California State Prison, Centinela ("Centinela"). On March 6, 2011, Plaintiff challenged his gang validation decision via an administrative grievance. On March 13, 2011, Plaintiff again challenged his gang validation decision via an administrative grievance. On May 30, 2011, Plaintiff submitted a staff complaint against several IGIU members, alleging the fabrication of gang evidence to secure Plaintiff's validation as a gang member and indeterminate Security Housing Unit placement. On June 1, 2011, Plaintiff organized multiple prisoners who had similarly experienced and challenged adverse acts stemming from IGIU members' misconduct. Plaintiff's organizing efforts were recorded in a roster that contained the names and signatures of the effected prisoners, as well as the log numbers of the grievances they filed against IGIU members.

On June 13, 2011, Plaintiff forwarded a letter to Centinela warden Domingo Uribe Jr., seeking to have his staff complaint against Centinela IGIU members investigated. On July 12, 2011, Mr. Uribe replied. Mr. Uribe agreed to review the alleged misconduct. On August 14, 2011, Plaintiff submitted a third administrative grievance challenging his gang validation.
On September 1, 2011, classification staff representative Luu formally endorsed Plaintiff's transfer to Pelican Bay State Prison to serve an indeterminate Secure Housing Unit ("SHU") term due to Plaintiff's gang validation. On October 26, 2011 (and during the pendency of the grievances challenging both Plaintiff's gang validation and the misconduct associated with the fabrication of gang evidence), Plaintiff was ordered onto a CDCR transportation bus for transfer. Because of the distance between Centinela and Pelican Bay State Prison, the transfer could not be completed in a day. Accordingly, there was a "'layover'" at California Correctional Institution Tehachapi (Plaintiff arrived at some point in the afternoon).

---

[1] Plaintiff refers to this unit as the "Elite Institutional Gang Investigative ('I.G.I.') Unit/Squad." (ECF No. 23, p. 2).

Immediately after exiting the bus Plaintiff was greeted by Tehachapi IGIU member defendant Adame, and was escorted to the receiving and release building of the institution. "Upon information and belief defendant Adame made the following comment to another prisoner on the bus: 'whats [sic] up with your homeboy, he does not want to cooperate. But, we're going to break him, I'm going to make sure I break him.'" (ECF No. 23, pgs. 9-10).

While defendant Adame was escorting Plaintiff, he "began to incessantly harass [Plaintiff] with stacoato [sic] remarks about; 1.) [Plaintiff's] pursuing grievances and complaints against [Centinela IGIU] members and his gang validation; 2.) Organizing prisoners to challenge IGI[U] squad members; 3.) [Plaintiff's] involvement in 'gang activity'; and 4.) The sort of hardship [Plaintiff] would experience if he did not cooperate by giving up the contraband he purportedly had and provide information on other prisoners to enable him (Adame) to validate and indeterminately segregate them." (Id. at p. 5).

Upon entering the receiving and release building Plaintiff was placed in a secluded single man metal holding cage, ordered to strip naked, and subjected to an unclothed body search. Plaintiff asked defendant Adame several questions, to which defendant Adame replied "'just answer our questions give up what you have and provide information that can be used to validate other inmates.'" (Id. at p. 6). Plaintiff responded by saying that he had no clue what defendant Adame was talking about, that Plaintiff did not involve himself with gang activity, that he did not have any disciplinary record to corroborate any claims of gang activity, and that he did not even have any tattoos.

At this point "defendant Adame became visibly upset and bluntly threatened that if [Plaintiff] did not become a confidential informant [Plaintiff] would not be released from contraband watch for a long time. Defendant Adame also stated 'so, I also know you like to file grievances against squad members. Well unlike where you're coming from, don't concern yourself with submitting them now because here we use the forms as toilet tissue, I'm sure you see how that would just be a waste of time for you.'" (Id.).

After the strip search was concluded with negative contraband results, defendant Adame informed Plaintiff that he was being placed on contraband surveillance watch. At this point

1   "[d]efendant Adame placed [Plaintiff] in waist chains and handcuffs. Then, Adame applied
2   black mittons [sic] on [Plaintiff] which even at a distance, emitted a foul stench that made both
3   their filthy and unsanitized [sic] condition readily obvious. This was followed by placing
4   plexi-cuffs (or zip-ties) on top of the mittons [sic], then Adame wrapped several layers of two
5   (2) and one half (1/2) inch wide scotch tape around [Plaintiff's] wrists to secure both the
6   mittons [sic] and zip-ties. Next, Adame locked chained metal-shackles around [Plaintiff's]
7   ankles, tucked [Plaintiff's] jumpsuit pant legs into his socks and similarly wrapped several
8   layers of scotch tape around the metal-cuffs these restraints remained on [Plaintiff] from
9   October 26 until November 11." (Id.).

   For the next 16 days Plaintiff was forced to endure the restraints described above
without adequate reprieve, despite multiple negative results for contraband. The defendants did
not get the requisite approvals to keep Plaintiff on contraband surveillance watch for as long as
they did. Additionally, neither of the holding cells Plaintiff was kept in were configured for
prolonged housing. The first holding cell was located in the receiving and release building.
"At approximately 8 by 15 feet, the cells only furniture was a small wooden bench; and while a
sunk/toilet combination facility was present, [Plaintiff] had no accessability [sic] to it due to it
being heavily covered and taped over." (Id. at p. 7). The second cell was in the visiting
building. "At approximately 8 by 20 feet, the cell had no toilet or sink and only a small
wooden bench." (Id.). This cell was only four feet from a door leading to the outside, and
there was a five to six inch gap at the bottom of the door. During the time Plaintiff was held in
this cell, "the temperature outside was approximately 40 degrees below (snow felled [sic] and
stayed on the ground outside), [Plaintiff] was never given winter clothing, and was left to
huddle in a freezing cell while the officers guarding were heavily clothed." (Id. at p. 9).

   During this 16 day ordeal Plaintiff "was not allowed to shower, save, brush his teeth[,]
exercise or lay down to sleep nor rest." (Id. at p. 7). "Being deprived of basic hygienic and
health practices [Plaintiff] could not prevent developing a sharply repelling odor and a semi-
catatonic state of mind from lack of proper rest. Further having his hands in the damp dark
space within the unsanitized [sic] mittons [sic] for a prolong [sic] period of time, [Plaintiff]

contracted a [sic] aggressive skin fungal infection on both of his hands…. [Plaintiff] also contracted a similarly aggressive toenail fungal infection…." (Id.). Additionally, "prolong [sic] application of the physical restraints generated constant chafing. And the incessant chafing resulted in the metal and plastic restraints burrowing through [Plaintiff's] skin around his wrist and ankles leaving permanent scaring there." (Id.). Further, at no time was Plaintiff provided with a blanket or a mattress, and a bright light was kept on 24 hours a day. (Id. at p. 14).

"On October 28, 2011, [Plaintiff] volunteered to provide a bowel movement. [Plaintiff] was brought to the middle of the [receiving and release] terminal where a portable latrine was placed in plain view of other prisoners and guards (male and female), and was required to defecate there. When asked why he was being exhibited in such a fashion, the officer replied: 'your buddy (meaning Adame) is what he requested.' The bowel movement rendered a negative result for contraband." (Id. at p. 10). Later that day, defendant Lundy stopped by the receiving and release building. After Plaintiff ascertained his rank, Plaintiff asked him the basis of the decision to keep him on contraband surveillance watch, especially in light of providing a bowel movement that was negative for contraband earlier in the day. Plaintiff also asked for a blanket and a mattress. "Scoffing, defendant Lundy stated 'just cooperate and give up what you have. Make everyone's life easier.'" (Id. at p. 10).

On October 31, 2011, defendant Tyree came into the receiving and release building. Plaintiff asked defendant Tyree why he was not being allowed to shower or brush his teeth, and why he was not being provided with a mattress or blanket. Defendant Tyree replied "'as soon as you give up what you have up your ass, and the more you are able to help us [(i.e., provide information)] the quicker I can make this nightmare end.'" (Id.) (brackets in original). "Tyree and Adame also suggested that [Plaintiff] should worry about being placed on single cell status (a threat intended to create the perception that he had become an informant) in order to prompt [Plaintiff's] cooperation. (Id. at pgs. 10-11). For the remainder of the watch, both defendant Adame and defendant Tyree kept harassing Plaintiff, and when Plaintiff "asked if he could at

least wash his right hand (the only extremity released to feed and relieve himself) Tyree simply replied 'not right now.'" (Id. at p. 11).

On that same day, defendant Lundy stopped by, and Plaintiff "once again asked for an opportunity to washup [sic], a mattress/blanket and the reasoning for his [contraband surveillance watch] placement. [Plaintiff] also informed defendant Lundy that he was not feeling well, and asked to see medical staff. Defendant Lundy simply did not acknowledge [Plaintiff] in any manner." (Id.).

On November 2, 2011, Plaintiff informed prison officials that he believed he was cut around his ankles and wrists. Plaintiff was completely ignored.

On November 3, 2011, Plaintiff provided a third bowel movement that was negative for contraband. Later that day, defendant Adame and two other IGIU officers showed up. Defendant Adame, who was "'visibly upset, blurted 'if you think you got away, think again.' [Plaintiff] was ordered [out] of the cell and patted down. When asked if he can loosen the restraints to allow some stretching and check for cuts, Adame scoffed and said 'you better just brace yourself for what's next.'" (Id.).

Plaintiff was then moved to a holding cell in the visiting building. "When [Plaintiff] asked Adame for a blanket and mattress, defendant Adame – along with the other [IGIU] officers – simply laughed and said 'don't you wish you had just cooperated?'" (Id. at p. 12). Plaintiff also told defendant Adame that he did not feel well because he was not getting proper sleep and because he could not eat with the foul odor of his hand, and asked to see medical staff. "Defendant Adame replied by stating 'this ain't Burger King, you can't have it your way,' and followed that with 'you should've cooperated, after tonight I'm sure you'd wish you would've.'" (Id.).

"From November 3, 2011, to November 5, 2011 [Plaintiff] remained in the freezing, dirty, and furnitureless visiting building holding cell. [Plaintiff] was provided no blanket, mattress[,] adequate inclement clothing nor opportunities to shower, shave or even wash his hands. Further, his request to see medical staff simply were ignored." (Id.).

On November 5, 2011, Office Tingly was assigned to guard Plaintiff. He was shocked at the freezing temperature where Plaintiff was being held, and had Plaintiff moved back to the holding cell in the receiving and release building.

On November 7, 2011, Plaintiff again asked defendants Lundy and Tyree for the chance to wash up, and for a mattress or blanket. "Defendants [sic] Lundy replied by saying 'you can end this now, give up what you have and cooperate.' Then looking at Tyree and smirking, asked 'or he can just file a 602 and complain like he usually does right?' Replying, Tyree said 'he has that option, not sure how far he'll get with that hand tied up though.'" (Id. at pgs. 12-13).

On or about November 9, 2011, Plaintiff was taken to attend an Institution Classification Committee Hearing comprised of high ranking administrative officials, including the Warden. At the hearing, "Plaintiff addressed defendant Lundy by asking: 1.) Why was [Plaintiff] placed on [contraband surveillance watch]; 2.) After multiple bowel movements and x-ray examinations, why was [Plaintiff] still being kept on [contraband surveillance watch]; and, 3.) After once more expressing not feeling well and having cuts from the restraints, why was he not allowed to see medical personal? Defendant Lundy… replied with 'just give one more negative bowel movement and x-ray result, and all will end.' Lundy's response completely ignored the hygiene and medical issues." (Id. at p. 13).

On November 10, 2011, Plaintiff provided yet another bowel movement that was negative for contraband. However, Plaintiff was still not released from contraband surveillance watch. On or about November 11, 2011, Plaintiff had another bowel movement that was negative for contraband, and was finally released. "When the restraints were removed, [Plaintiff] had numerous abrasions on all of his extremities. These contained both caked on and fresh blood." (Id. at 14).

"Plaintiff submitted a grievance to the prison appeals coordinator requesting that adverse actions be taken against the defendants in this case for subjecting Plaintiff to cruel and unusual punishment." (Id. at 15). The appeals coordinator failed to respond, even after several requests from Plaintiff to know the status of his appeal.

Plaintiff asserts the following claims: 1) cruel and unusual punishment in violation of the Eighth Amendment; 2) inadequate health care in violation of the Eighth Amendment;[2] 2) violation of Plaintiff's First Amendment right of access to the courts; and 4) retaliation in violation of the First Amendment.

### III.     ACCESS TO THE COURTS

#### A.     Legal Standards

Under the First Amendment, prisoners have the right to access the courts and the right to petition the government for a redress of grievances. See Bounds v. Smith, 430 U.S. 817, 821 (1977). To establish a violation of the right of access to the courts, a prisoner must establish that he has suffered an "actual injury" as a result of a prison official's misconduct. Lewis v. Casey, 518 U.S. 343, 351–52 (1996). An "actual injury" exists where a prisoner has been "hindered [in his] efforts to pursue a legal claim." Id. at 351; see also Silva v. Vittorio, 658 F.3d 1090, 1102–03 (9th Cir. 2010) (recognizing that access-to-courts claim requires an actual injury to court access), overruled on other grounds as stated by Richey v. Dahne, 807 F.3d 1202, 1209 n.6 (9th Cir. 2015).

#### B.     Analysis of Plaintiff's Allegations

Plaintiff's Third Amended Complaint fails to state a claim for violation of Plaintiff's right to access the courts. Plaintiff alleges that the prison has mishandled or ignored his grievance. However, at this point, Plaintiff has not been hindered in his efforts to pursue his legal claim based on the prison's lack of a response to his grievance. While these allegations will be relevant in determining the issue of whether Plaintiff has exhausted his administrative remedies and can go forward with this lawsuit on its merits, the prison's failure to address the grievance properly itself does not raise a constitutional claim.

\\\

\\\

---

[2] While Plaintiff's Third Amended Complaint does not directly state a claim for inadequate health care in violation of the Eighth Amendment, he alleges sufficient facts to state a claim for inadequate health care.

**IV.     CONCLUSION**

The Court has found in an order that will be entered concurrently with this order that Plaintiff has stated a claim against defendants Adame, Tyree, and Lundy for violations of the Eighth Amendment based on conditions of confinement, against defendants Adame and Lundy for inadequate health care in violation of the Eighth Amendment, and against defendants Adame, Tyree, and Lundy for retaliation in violation of the First Amendment.  All three defendants are being sued in their official and individual capacities.

However, Plaintiff has failed to state any other claims, or claims against any other defendants.  The Court thus recommends dismissal of all other claims and defendants besides those listed in the paragraph above.

This case was filed in August of 2013, and Plaintiff is now on his Third Amended Complaint.  Plaintiff has already been given leave to file two amended complaints with instructions regarding the law to inform that amended complaint (Plaintiff's First Amended Complaint was never screened).  Accordingly, the Court does not believe further amendment would cure the deficiencies in the remaining claims and defendants.

Based on the foregoing, it is HEREBY RECOMMENDED that all other claims and defendants be dismissed from this action with prejudice.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30) days after being served with these Findings and Recommendations, Plaintiff may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

\\\
\\\
\\\
\\\

Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **November 4, 2016**         /s/ Erica P. Grosjean
                                    UNITED STATES MAGISTRATE JUDGE