UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JOSE LEDESMA,

           Plaintiff,

     v.

ADAME, et al.,

           Defendants.

Case No. 1:13-cv-01227-AWI-EPG (PC)

FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANTS' MOTION TO DISMISS BE GRANTED IN PART AND DENIED IN PART

(ECF NO. 59)

OBJECTIONS, IF ANY, DUE WITHIN TWENTY-ONE DAYS

## I.     BACKGROUND

Jose Ledesma ("Plaintiff") is a state prisoner proceeding *in forma pauperis* in this civil rights action filed pursuant to 42 U.S.C. § 1983. This case now proceeds on Plaintiff's Third Amended Complaint, which was filed on September 15, 2016. (ECF No. 23.) Plaintiff's Third Amended Complaint was screened, and the Court found that Plaintiff "stated a claim against defendants Adame, Tyree, and Lundy ["Defendants"] for violations of the Eighth Amendment based on conditions of confinement, against defendants Adame and Lundy for inadequate health care in violation of the Eighth Amendment, and against defendants Adame, Tyree, and Lundy for retaliation in violation of the First Amendment." (ECF No. 24 at 15; ECF No. 28 at 1.) All other claims and defendants were dismissed. (ECF No. 28 at 2.)

On December 21, 2017, Defendants filed a motion to dismiss. (ECF No. 59.) On January 25, 2018, Plaintiff filed an opposition to the motion to dismiss. (ECF No. 63.) On January 26, 2018, Plaintiff filed an amended opposition to the motion to dismiss. (ECF No. 64.) Defendants filed a reply to Plaintiff's opposition on February 15, 2018. (ECF No. 65.) Defendants' motion to dismiss is now before the Court.

As the Court finds that Plaintiff has stated claims under both the Eighth and First Amendments and that Defendants are not entitled to qualified immunity at this stage in the proceedings, the Court will recommend that Defendants' motion to dismiss be denied with respect to these claims. However, the Court finds that Plaintiff has failed to allege sufficient facts to warrant declaratory or injunctive relief against Defendants, because Plaintiff has been transferred to another prison. Accordingly, the Court will recommend that Defendants' request to dismiss Plaintiff's requests for declaratory and injunctive relief be granted, and that Defendants' request that they be dismissed in their official capacities be granted.

## II.      PLAINTIFF'S THIRD AMENDED COMPLAINT

Plaintiff filed his Third Amended complaint on September 15, 2016. (ECF No. 23.) As previously summarized, Plaintiff's allegations are as follows.

In February of 2011, Plaintiff was subject to a gang validation investigation by members of the California Department of Corrections and Rehabilitation ("CDCR")'s Institutional Gang Investigation Unit ("IGIU")[1] assigned to the California State Prison, Centinela ("Centinela"). On March 6, 2011, Plaintiff challenged his gang validation decision via an administrative grievance. On March 13, 2011, Plaintiff again challenged his gang validation decision via an administrative grievance. On May 30, 2011 Plaintiff submitted a staff complaint against several IGIU members, alleging the fabrication of gang evidence to secure Plaintiff's validation as a gang member and indeterminate Security Housing Unit placement. On June 1, 2011, Plaintiff organized multiple prisoners who had similarly experienced and challenged adverse acts stemming from IGIU members' misconduct. Plaintiff's organizing efforts were recorded in a roster that contained the names and signatures of the affected prisoners, as well as the log numbers of the grievances they filed against IGIU members.

On June 13, 2011, Plaintiff forwarded a letter to Centinela warden Domingo Uribe Jr., seeking to have his staff complaint against Centinela IGIU members investigated. On July 12,

---

[1] Plaintiff refers to this unit as the "Elite Institutional Gang Investigative ('I.G.I.') Unit/Squad.". (ECF No. 23 at 2.)

2011, Mr. Uribe replied and agreed to review the alleged misconduct. On August 14, 2011, Plaintiff submitted a third administrative grievance challenging his gang violation. On September 1, 2011, classification staff representative Luu formally endorsed Plaintiff's transfer to Pelican Bay State Prison to serve an indeterminate Secure Housing Unit ("SHU") term due to Plaintiff's gang validation. On October 26, 2011 (and during the pendency of the grievances challenging both Plaintiff's gang validation and the misconduct associated with the fabrication of gang evidence), Plaintiff was ordered onto a CDCR transportation bus for transfer. Because of the distance between Centinela and Pelican Bay State Prison, the transfer could not be completed in a day. Accordingly, there was a "layover" at California Correctional Institution Tehachapi ("CCI"), where Plaintiff arrived at some point in the afternoon. Immediately after exiting the bus, Plaintiff was greeted by Tehachapi IGIU member Defendant Adame and was escorted to the receiving and release building of the institution. "Upon information and belief Defendant Adame made the following comment to another prisoner on the bus: 'whats [sic] up with your homeboy, he does not want to cooperate. But, we're going to break him, I'm going to make sure I break him.'" (ECF No. 23 at 9-10.)

While Defendant Adame was escorting Plaintiff, he "began to incessantly harass [Plaintiff] with stacoato [sic] remarks about; 1.) [Plaintiff's] pursuing grievances and complaints against [Centinela IGIU] members and his gang validation; 2.) Organizing prisoners to challenge IGI[U] squad members; 3.) [Plaintiff's] involvement in 'gang activity'; and 4.) The sort of hardship [Plaintiff] would experience if he did not cooperate by giving up the contraband he purportedly had and provide information on other prisoners to enable him (Adame) to validate and indeterminately segregate them." (Id. at 5.)

Upon entering the receiving and release building, Plaintiff was placed in a secluded single man metal holding cage, ordered to strip naked, and subjected to an unclothed body search. Plaintiff asked Defendant Adame several questions, to which Defendant Adame replied "'just answer our questions give up what you have and provide information that can be used to validate other inmates.'" (Id. at 6.) Plaintiff responded by saying that he had no clue what Defendant Adame was talking about, that Plaintiff did not involve himself with gang activity,

3

that he did not have any disciplinary record to corroborate any claims of gang activity, and that he did not even have any tattoos.

At this point "defendant Adame became visibly upset and bluntly threatened that if [Plaintiff] did not become a confidential informant [Plaintiff] would not be released from contraband watch for a long time. Defendant Adame also stated 'so, I also know you like to file grievances against squad members. Well unlike where you're coming from, don't concern yourself with submitting them now because here we use the forms as toilet tissue, I'm sure you see how that would just be a waste for you.'" (<u>Id.</u>)

After the strip search was concluded with negative contraband results, defendant Adame informed Plaintiff that he was being placed on contraband surveillance watch. At this point "Defendant Adame placed [Plaintiff] in a waist chain and handcuffs. Then, Adame applied black mittons [sic] on [Plaintiff] which even at a distance, emitted a foul stench that made both their filthy and unsanitized [sic] condition readily obvious. This was followed by placing plexi-cuffs (or zip-ties) on top of the mittons [sic], then Adame wrapped several layers of two (2) and one half (1/2) inch wide scotch tape around [Plaintiff's] wrists to secure both the mittons [sic] and zip-ties. Next Adame locked chained metal-shackles around [Plaintiff's] ankles, tucked [Plaintiff's] jumpsuit pant legs into his socks and similarly wrapped several layers of scotch tape around the metal-cuffs. These restraints remained on [Plaintiff] from October 26 until November 11." (<u>Id.</u>)

For the next sixteen days Plaintiff was forced to endure the restraints described above without adequate reprieve, despite multiple negative results for contraband. The defendants did not get the requisite approvals to keep Plaintiff on contraband surveillance watch for as long as they did. (<u>Id.</u> at 8.) Additionally, neither of the holding cells Plaintiff was kept in was configured for prolonged housing. The first holding cell was located in the receiving and release building. "At approximately 8 by 15 feet, the cell's only furniture was a small wooden bench; and while a sink/toilet combination facility was present, [Plaintiff] had no accessability [sic] to it due to it being heavily covered and taped over." (<u>Id.</u> at 7.) The second cell was in the visiting building. "At approximately 8 by 20 feet, the cell had no toilet or sink and only a small

wooden bench." (Id.)  This cell was only four feet from a door leading to the outside, and there was a five to six inch gap at the bottom of the door.  During the time Plaintiff was held in this cell, "the temperature outside was approximately 40 degrees below (snow felled [sic] and stayed on the ground outside), [Plaintiff] was never given winter clothing, and was left to huddle in a freezing cell while the officers guarding were heavily clothed." (Id. at 9.)

During this sixteen day ordeal, Plaintiff "was not allowed to shower, shave, brush his teeth[,] exercise[,] or lay down to sleep nor rest." (Id. at 7.)  "Being deprived of basic hygienic and health practices[,] [Plaintiff] could not prevent developing a sharply repelling odor and a semi-catatonic state of mind from lack of proper rest.  Further having his hands in the damp dark space within the unsanitized [sic] mittons [sic] for a prolong [sic] period of time, [Plaintiff] contracted a [sic] aggressive skin fungal infection on both of his hands…. [Plaintiff] also contracted a similarly aggressive toenail fungal infection…." (Id.)  Additionally, "prolong [sic] application of the physical restraints generated constant chafing.  And the incessant chafing resulted in the metal and plastic restraints burrowing through [Plaintiff's] skin around his wrist and ankles leaving permanent scaring there." (Id.)  Further, at no time was Plaintiff provided with a blanket or a mattress, and a bright light was kept on twenty-four hours a day (Id. at 14.)

"On October 28, 2011, [Plaintiff] volunteered to provide a bowel movement.  [Plaintiff] was brought to the middle of the [receiving and release] terminal where a portable latrine was placed in plain view of other prisoners and guards (male and female), and was required to defecate there.  When asked why he was being exhibited in such a fashion, the officer replied: 'your buddy (meaning Adame) is what he requested.'  The bowel movement rendered a negative result for contraband." (Id. at 10.)  Later that day, Defendant Lundy stopped by the receiving and release building.  After Plaintiff ascertained his rank, Plaintiff asked him the basis of the decision to keep him on contraband surveillance watch, especially in light of providing a bowel movement that was negative for contraband earlier in the day.  Plaintiff also asked for a blanket and a mattress.  "Scoffing, defendant Lundy stated 'just cooperate and give up what you have.  Make everyone's life easier.'" (Id.)

On October 31, 2011, Defendant Tyree came into the receiving and release building. Plaintiff asked Defendant Tyree why he was not being allowed to shower or brush his teeth, and why he was not being provided with a mattress or blanket. Defendant Tyree replied "'as soon as you give up what you have up your ass, and the more you are able to help us [(i.e., provide information)] the quicker I can make this nightmare end.'" (Id.) (brackets in original). "Tyree and Adame also suggested that [Plaintiff] should worry about being placed on single cell status (a threat intended to create the perception that he had become an informant) in order to prompt [Plaintiff's] cooperation." (Id. at 10-11.) For the remainder of the watch, both Defendant Adame and Defendant Tyree kept harassing Plaintiff, and when Plaintiff "asked if he could at least wash his right hand (the only extremity released to feed and relieve himself) Tyree simply replied 'not right now.'" (Id. at 11.)

On the same day, Defendant Lundy stopped by, and Plaintiff "once again asked for an opportunity to washup [sic], a mattress/blanket[,] and the reasoning for his [contraband surveillance watch] placement. [Plaintiff] also informed defendant Lundy that he was not feeling well, and asked to see medical staff. Defendant Lundy simply did not acknowledge [Plaintiff] in any manner." (Id.)

On November 2, 2011, Plaintiff informed prison officials that he believed he was cut around his ankles and wrists. Plaintiff was completely ignored.

On November 3, 2011, Plaintiff provided a third bowel movement that was negative for contraband. Later that day, Defendant Adame and two other IGIU officers showed up. Defendant Adame, who was "visibly upset, blurted 'if you think you got away, think again.' [Plaintiff] was ordered [out] of the cell and patted down. When asked if he can loosen the restraints to allow some stretching and check for cuts, Adame scoffed and said 'you better just brace yourself for what's next.'" (Id.)

Plaintiff was then moved to a holding cell in the visiting building. "When [Plaintiff] asked Adame for a blanket and mattress, defendant Adame – along with the other [IGIU] officers – simply laughed and said 'don't you wish you had just cooperated?'" (Id. at 12.) Plaintiff also told defendant Adame that he did not feel well because he was not getting proper

sleep and because he could not eat with the foul odor of his hand, and asked to see medical staff. "Defendant Adame replied by stating 'this ain't Burger King, you can't have it your way,' and followed that with 'you should've cooperated, after tonight I'm sure you'd wish you would've.'" (Id.)

"From November 3, 2011, to November 5, 2011 [Plaintiff] remained in the freezing, dirty, and furnitureless visiting building holding cell. [Plaintiff] was provided no blanket, mattress[,] adequate inclement clothing[,] nor opportunities to shower, shave[,] or even wash his hands. Further, his requests to see medical staff simply were ignored." (Id.)

On November 5, 2011, Officer Tingly was assigned to guard Plaintiff. He was shocked at the freezing temperature where Plaintiff was being held, and had Plaintiff moved back to the holding cell in the receiving and release building.

On November 7, 2011, Plaintiff again asked Defendants Lundy and Tyree for the chance to wash up and for a mattress or blanket. "Defendants [sic] Lundy replied by saying 'you can end this now, give up what you have and cooperate.' Then looking at Tyree and smirking, asked 'or he can just file a 602 and complain like he usually does right?' Replying, Tyree said 'he has that option, not sure how far he'll get with that hand tied up though.'" (Id. at 12-13.)

On or about November 9, 2011, Plaintiff was taken to attend an Institution Classification Committee Hearing comprised of high ranking administrative officials, including the Warden. At the hearing, "Plaintiff addressed defendant Lundy by asking: 1.) Why was [Plaintiff] placed on [contraband surveillance watch]; 2.) After multiple bowel movements and x-ray examinations, why was [Plaintiff] still being kept on [contraband surveillance watch]; and, 3.) After once more expressing not feeling well and having cuts from the restraints, why was he not allowed to see medical personnel? Defendant Lundy… replied with 'just give one more negative bowel movement and x-ray result, and all will end.' Lundy's response completely ignored the hygiene and medical issues." (Id. at 13.)

On November 10, 2011, Plaintiff provided yet another bowel movement that was negative for contraband. However, Plaintiff was still not released from contraband surveillance

7

watch. On or about November 11, 2011, Plaintiff had another bowel movement that was negative for contraband, and was finally released. "When the restraints were removed, [Plaintiff] had numerous abrasions on all of his extremities. These contained both caked on and fresh blood." (Id. at 14.)

"Plaintiff submitted a grievance to the prison appeals coordinator requesting that adverse actions be taken against the defendants in this case for subjecting Plaintiff to cruel and unusual punishment." (Id. at 15.) The appeals coordinator failed to respond, even after several requests from Plaintiff to know the status of his appeal.

Plaintiff asserts the following claims against Defendants: 1) cruel and unusual punishment in violation of the Eighth Amendment; 2) inadequate health care in violation of the Eighth Amendment; 3) violation of Plaintiff's First Amendment Right of access to the courts; and 4) retaliation in violation of the First Amendment.

After screening Plaintiff's Third Amended Complaint, the Court found that Plaintiff "stated a claim against defendants Adame, Tyree, and Lundy for violations of the Eighth Amendment based on conditions of confinement, against defendants Adame and Lundy for inadequate health care in violation of the Eighth Amendment, and against defendants Adame, Tyree, and Lundy for retaliation in violation of the First Amendment." (ECF No. 24 at 15.) The Court found that Plaintiff failed to state any other claims or claims against any other defendants. (Id.) On November 7, 2016, the Court issued its findings and recommendations consistent with the screening order. (ECF No. 25.)

On January 20, 2017, District Judge Anthony W. Ishii adopted this Court's findings and recommendations, ordering that this action proceed on Plaintiff's Third Amended Complaint "against defendants Adame, Tyree, and Lundy for violation of the Eighth Amendment based on conditions of confinement, against Defendants Adame and Lundy for inadequate health care in violation of the Eighth Amendment, and against Defendants Adame, Tyree, and Lundy for retaliation in violation of the First Amendment," and dismissing all other claims and defendants. (ECF No. 28 at 2.)

///

### III.   EXHAUSTION

On February 3, 2017, Defendants filed a motion for summary judgment on the ground that Plaintiff failed to exhaust his available administrative remedies before filing this action. (ECF No. 30.)  The Court set an <u>Albino</u> evidentiary hearing because it appeared that Plaintiff's evidence created a dispute of fact regarding whether Plaintiff exhausted his available administrative remedies.  (ECF Nos. 36 & 41.)

Upon evaluating the evidence presented, the Court recommended finding that Plaintiff satisfied the exhaustion requirement.  (ECF No. 52 at 18.)  The Court based this recommendation on the following: Plaintiff entered into evidence a copy of the 602 he allegedly filed as well as the originals of four Form 22s that he submitted inquiring about the 602, there was no direct evidence that any of these documents were forged, the documents were internally consistent, the Form 22s had signatures from three different officers on them that did not appear to match Plaintiff's signature, and evidence presented by both parties that 602s are sometimes lost.  (<u>Id.</u> at 17-18.)

On November 21, 2017, District Judge Anthony W. Ishii adopted this Court's findings and recommendations in full.  (ECF No. 57 at 3.)

### IV.   DEFENDANT'S MOTION TO DISMISS

#### a.  Legal Standard for Motion to Dismiss

In considering a motion to dismiss, the Court must accept all allegations of material fact in the complaint as true.  <u>Erickson v. Pardus</u>, 551 U.S. 89, 93–94 (2007); <u>Hosp. Bldg. Co. v. Rex Hosp. Trustees</u>, 425 U.S. 738, 740 (1976).  The Court must also construe the alleged facts in the light most favorable to the plaintiff.  <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974), <u>abrogated on other grounds by</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982); <u>Barnett v. Centoni</u>, 31 F.3d 813, 816 (9th Cir.1994) (per curiam).  All ambiguities or doubts must also be resolved in the plaintiff's favor.  <u>See</u> <u>Jenkins v. McKeithen</u>, 395 U.S. 411, 421 (1969).  In addition, *pro se* pleadings "must be held to less stringent standards than formal pleadings drafted by lawyers."  <u>Hebbe v. Pliler</u>, 627 F.3d 338, 342 (9th Cir. 2010) (holding that *pro se* complaints

///

should continue to be liberally construed after <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009)).[2]

A motion to dismiss pursuant to Rule 12(b)(6) operates to test the sufficiency of the complaint.  <u>See</u> <u>Iqbal</u>, 556 U.S. at 679.  Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." <u>Scheuer</u>, 416 U.S. at 236 (1974).

The first step in testing the sufficiency of the complaint is to identify any conclusory allegations.  <u>Iqbal</u>, 556 U.S. at 679.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> at 678 (citing <u>Twombly</u>, 550 U.S. at 555).  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555 (citations and quotation marks omitted).

After assuming the veracity of all well-pleaded factual allegations, the second step is for the court to determine whether the complaint pleads "a claim to relief that is plausible on its face." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 556) (rejecting the traditional 12(b)(6) standard set forth in <u>Conley</u>, 355 U.S. at 45-46).  A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> at 678 (citing <u>Twombly</u>, 550 U.S. at 556).  The standard for plausibility is not akin to a "probability requirement," but it requires "more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u>

In deciding a Rule 12(b)(6) motion, the Court generally may not consider materials outside the complaint and pleadings.  <u>Cooper v. Pickett</u>, 137 F.3d 616, 622 (9th Cir. 1998);

_____

[2] It appears that even if the formerly *pro se* litigant is currently represented, the more lenient standard for *pro se* litigants is still applied in considering a motion to dismiss if the relevant pleading was filed when the litigant was *pro se*.  <u>See</u> <u>Rosati v. Igbinoso</u>, 791 F.3d 1037, 1039 (9th Cir. 2015) (noting both that the plaintiff was "now represented by counsel" and the lenient standard for *pro se* litigants, and proceeding with a lenient analysis because the relevant complaint was a pro se complaint). However, even if the Court did not apply the *pro se* litigant standard because Plaintiff is currently represented, the Court's recommendation would be the same.

Gumataotao v. Dir. of Dep't of Revenue & Taxation, 236 F.3d 1077, 1083 (9th Cir. 2001).

**b. Eighth Amendment Conditions of Confinement Claims**

i. Legal Standard

Under the Eighth Amendment, prison officials have an affirmative duty to "provide humane conditions of confinement." Farmer v. Brennan, 511 U.S. 825, 832 (1994). Conditions of confinement may, consistent with the Constitution, be restrictive and harsh. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006); Osolinski v. Kane, 92 F.3d 934, 937 (9th Cir. 1996); Jordan v. Gardner, 986 F.2d 1521, 1531 (9th Cir. 1993) (en banc). However, prison officials must provide for prisoner's "basic human needs," including "food, clothing, shelter, medical care, and reasonable safety." Helling v. Mckinney, 509 U.S. 25, 32 (1993) (quoting DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 199-200 (1989)). A prison official violates the Eighth Amendment if the following two prongs are satisfied: 1) the relevant deprivation must be "objectively, 'sufficiently serious,'" and 2) the prison official demonstrated subjective "'deliberate indifference' to inmate health or safety." Farmer v. Brennan, 511 US. 825, 834 (1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298, 302-03 (1991)).

In examining whether the relevant deprivation is "objectively, 'sufficiently serious,'" "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise -- for example, a low cell temperature at night combined with a failure to issue blankets." Wilson, 501 U.S. at 304. However, "[t]o say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." Id. at 305.

The requisite state of mind for "deliberate indifference" is one of "more than mere negligence," but does not go so far as to require a "'maliciou[s] and sadisti[c]'" state of mind.

Farmer, 511 U.S. at 835-36 (quoting Wilson, 501 U.S. at 302-03). Thus, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. However, the factfinder "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. at 842 (citation omitted).

ii.  Summary of Defendants' Argument

Defendants argue that Plaintiff has failed to state a claim under the Eighth Amendment for unconstitutional conditions of confinement. (ECF No. 59 at 14.) As to the objective prong of a conditions of confinement claim, Defendants argue that the conditions Plaintiff was subjected to were not sufficiently serious because they did not entail an "extreme" deprivation of life's necessities and because the conditions were in service of the legitimate correctional goal of limiting the amount of contraband in prisons. (Id. at 15.) Defendants note that the conditions Plaintiff was subjected to were "undoubtedly uncomfortable," but maintain that the temporary deprivation of access to hygiene and freedom from restraints does not rise to the level of "sufficiently serious" that the objective test calls for. (Id.)

As to the subjective prong of a conditions of confinement claim, Defendants argue that they were not deliberately indifferent to Plaintiff's health or safety because they were abiding by the protocol established at the time for contraband surveillance watch, as memorialized in the Department Operations Manual ("DOM") § 52050.23. (Id. at 17.) Additionally, Defendants allege that both defendants Tyree and Lundy told Plaintiff that he would be released from contraband watch once it was determined that Plaintiff was not in possession of contraband. (Id. at 16-17). Defendants also allege that Plaintiff's allegations regarding Defendant Adame's statements and conduct (i.e. allegedly forcing Plaintiff to defecate in view of other prisoners and guards, to endure a "freezing" cell, and to walk in shackles) do not demonstrate the requisite deliberate indifference to the alleged harm Plaintiff was subjected to. (Id.)

### iii. Summary of Plaintiff's Argument

Plaintiff argues that he has pled a viable Eighth Amendment conditions of confinement case. (ECF No. 64 at 11.) Plaintiff does not allege that contraband surveillance watch itself is unconstitutional under the Eighth Amendment, but rather that the conditions of his contraband surveillance watch were unconstitutional. (Id. at 12.) Plaintiff alleges that, for sixteen days, his hands and feet were shackled and restrained with tape, he was forced to wear unsanitary mittens, he was forced to eat and use the bathroom with the same hand that he was not permitted to wash, he was not given a mattress or blanket throughout his time on surveillance even when he was in a freezing cell, he was not allowed to shower, shave, brush his teeth, wash his hands, or get proper sleep, and he was subjected to constant bright lights. (Id. at 13.) Plaintiff argues that the foregoing facts satisfy the objective "sufficiently serious" component of his conditions claims. (Id. at 13-14.)

Plaintiff alleges that the subjective "deliberate indifference" component is also satisfied for each defendant, as each defendant was aware of the conditions Plaintiff was in. (ECF No. 64 at 15, 17.) As to Defendant Adame, Plaintiff alleges that Defendant Adame was responsible for putting Plaintiff on contraband surveillance watch in the complained of conditions, kept Plaintiff in these conditions in spite of negative contraband test results, appeared to direct other staff on how procedures like Plaintiff's bowel movements should be monitored, transferred Plaintiff to a freezing cell that did not have a sink or toilet, and taunted Plaintiff about his odor from his inability to observe proper hygiene. (Id. at 15.) Plaintiff also alleges Defendant Adame made comments to him, such as, "if you think you got away, think again," "you better just brace yourself for what's next," and "this isn't Burger King, you can't have it your way," which indicate Defendant Adame was aware of the severity of the conditions. (Id. at 15, 17.)

As to Defendant Lundy, Plaintiff alleges that Defendant Lundy observed the conditions Plaintiff was in and did nothing to alleviate them. Defendant Lundy also did not provide assistance to Plaintiff, even though Plaintiff requested a blanket and mattress, to be able to wash up, and to see medical staff. (Id. at 15-16.)

As to Defendant Tyree, Plaintiff alleges that Defendant Tyree also witnessed Plaintiff's

13

conditions of confinement, did nothing to alleviate them, and declined Plaintiff's request for a mattress and to wash up. (Id. at 16.) Plaintiff alleges Defendant Tyree also taunted him about his odor. (Id.) Plaintiff alleges that when he asked Defendant Tyree why he could not see medical personnel for the cuts on his wrists from his restraints, Defendant Tyree responded that the conditions would remain the same until Plaintiff provided another bowel movement. (Id.)

### iv. Analysis

The Court finds that Plaintiff has alleged sufficient facts to establish that the conditions he endured were "sufficiently serious" and that Defendants acted with "deliberate indifference" to Plaintiff's health and safety. Plaintiff's allegations that, for sixteen days, he was shackled and restrained, forced to wear unsanitary mittens, prevented from practicing virtually any form of personal hygiene, denied a mattress or blanket even when he was placed in freezing temperatures, subjected to constant bright lights, and was unable to get proper sleep sufficiently plead "sufficiently serious" conditions. While some allegations may not be sufficient alone to satisfy the objective element of this test, when taken in combination with one another, the objective element is sufficiently pled. For example, Plaintiff's alleges that he was subjected to freezing temperatures while still being denied a blanket. These allegations clearly state a cognizable conditions of confinement claim. Wilson, 501 U.S. 298, 304 (1991) ("Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone… for example, a low cell temperature at night combined with a failure to issue blankets.").

The Court finds that Plaintiff also sufficiently pled facts to establish that Defendants were deliberately indifferent to Plaintiff's health or safety. First, Plaintiff alleges that Defendant Adame was responsible for putting Plaintiff on contraband surveillance watch and made comments that indicated that he was aware of Plaintiff's deplorable conditions. Additionally, Plaintiff alleges that all three Defendants witnessed Plaintiff's conditions of confinement and failed to alleviate them in spite of Plaintiff's requests that they do so, further supporting that Defendants were aware of Plaintiff's conditions. Moreover, based on the severity and longevity of the conditions mentioned above, the Court finds that the deplorability

of the conditions Plaintiff endured is "obvious." <u>Farmer v. Brennan</u>, 511 U.S. 825, 842 (1994) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). As Defendants interacted with Plaintiff while he was in these conditions, the Court finds that Plaintiff has sufficiently alleged that Defendants knew of the risk to Plaintiff's health and safety.

This analysis is supported by other cases from this district. <u>Raybon v. Totten</u>, E.D. CA Case No. 2:12-cv-01008, ECF No. 8 at 3 (plaintiff's allegation that "defendants Hardy and Totten [] depriv[ed] plaintiff of bedding, hygiene supplies, showers and soap for sixteen days [states a cognizable Eighth Amendment claim]."); <u>Hignite v. Felker</u>, 2008 U.S. Dist. LEXIS 111532, at *18 (E.D. Cal. July 11, 2008), <u>findings and recommendation adopted by</u> 2008 U.S. Dist. LEXIS 79192 (E.D. Cal. Aug. 21, 2008) (plaintiff's allegations that "he was placed on contraband watch in an unauthorized fashion for an excessive 84 hours, was denied a mattress for much of that time without running water, was forced to eat his food with his bare hands, was denied basic hygiene and adequate water and was restrained by multiple layers of tape, waist chains, handcuffs and leg restraints…" supported the denial of a motion to dismiss); <u>Romo v. Cate</u>, 2014 U.S. Dist. LEXIS 121363, at *22-23 (E.D. Cal. Aug. 29, 2014), <u>amended by</u> 2014 U.S. Dist. LEXIS 130573 (E.D. Cal. Sept. 15, 2014), <u>findings and recommendations adopted by</u> 2014 U.S. Dist. LEXIS 139840 (E.D. Cal. Sept. 30, 2014) ("the allegations are such that any officer who observed plaintiff during his stay on CSW [in which plaintiff was put in a holding cell without a toilet, water, a mattress, and all basic hygiene for eight days] *must have known* at some point that the conditions were unsanitary. Such an inference is enough to survive a motion to dismiss brought under Rule 12(b)(6).") (emphasis added).

Additionally, the Court is unpersuaded by Defendants' contention that they were not deliberately indifferent to the Plaintiff's conditions of confinement because they were complying with the DOM. The Court finds this assertion to be disingenuous because, taking Plaintiff's allegations as true, the relevant sections of the DOM that Defendants provide reveal that Defendants *did not* comply with the contraband surveillance watch protocol. First, according to DOM § 5250.23.3, "If the temperature in the isolated setting is below 65 degrees,

the inmate shall also be provided a blanket." (ECF No. 59 at 31.) Plaintiff alleges he was kept in a "freezing cell while the officers were heavily clothed" while "the temperature outside was approximately 40 degrees below (snow felled [sic] and stayed on the ground outside), [but] [Plaintiff] was never given winter clothing" or a blanket. (ECF No. 23 at 9; ECF No. 63 at 23.) More still, DOM § 5250.23.8 states the following:

> Normally, inmates will be retained on CSW for a period of not less than 72 hours or the inmate may be required to complete at least three bowel movements free of contraband prior to being removed from CSW.
> When it is determined by medical or custodial staff that the inmate may still be in possession of additional contraband at the conclusion of the 72[-]hour time period, approval to retain the inmate on CSW for an extended prior of time may be approved only by the Warden or Chief Deputy Warden.

(ECF No. 59 at 32.) Plaintiff alleges that Defendants did not obtain approval to keep Plaintiff on contraband surveillance watch for over 72 hours, and yet kept him on contraband surveillance watch for sixteen days. (ECF No. 23 at 8; ECF No. 64 at 11.) Additionally, Plaintiff alleges he was told he had to provide five negative bowel movements before he was released from contraband watch—which is two more than the DOM requires—and that he was maintained on contraband surveillance watch approximately five days after he had provided his requisite third negative bowel movement. (ECF No. 64 at 15-16, 26.)

Accordingly, the Court finds that Plaintiff has facts stating a cognizable Eighth Amendment conditions of confinement claim.

### c. Eighth Amendment Denial of Medical Care Claims

#### i. Legal Standard

"In order to state a cognizable [Eighth Amendment denial of medical care] claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."[3] Estelle v. Gamble, 429 U.S. 97, 106 (1976). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th

---

[3] The standard for deliberate indifference is set forth above in subsection (b).

Cir. 1997) (*en banc*) (quoting Estelle, 429 U.S. at 104). "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." Id. (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989)).

This standard applies "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id. at 104-05. Still, "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" Id. at 105-06.

ii.  Summary of Defendants Adame and Lundy's Argument

Defendants Adame and Lundy argue that Plaintiff has failed to satisfy the objective "serious medical needs" prong of his denial of medical care claim. (ECF No. 59 at 19.) Defendants Adame and Lundy allege that because Plaintiff did not seek medical attention immediately after his release from contraband surveillance watch, Plaintiff did not in fact suffer from any serious medical issues. (Id.)

Defendants Adame and Lundy also argue that Plaintiff did not satisfy the subjective "deliberate indifference" element. (Id.) Defendants Adame and Lundy allege that Plaintiff did not inform them of a serious medical condition, and that Plaintiff's complaints of his inability to practice personal hygiene and his difficulty sleeping were "vague and conclusory" and therefore provided insufficient notice. (Id.) Defendants Adame and Lundy assert that, while Plaintiff told "prison officials" that he had cuts on his wrist, Plaintiff did not tell this to Defendants Adame and Lundy in particular. (Id.) Defendants Adame and Lundy argue that Plaintiff's request of Defendant Adame to "check" for possible injuries was insufficient to establish that Plaintiff suffered from a serious medical condition. (Id.) Defendants Adame and Lundy also allege that Plaintiff's "vague complaints" that he was "not feeling well" or that he

17

was not getting "proper" sleep were insufficient to put them on notice that Plaintiff was at risk of substantial harm.  (<u>Id.</u>)  Defendants Adame and Lundy allege that Plaintiff has failed to allege sufficient facts to indicate that Defendants Adame and Lundy actually concluded that Plaintiff suffered from a serious medical condition and disregarded this risk.  (<u>Id.</u> at 20)

### iii.  Summary of Plaintiff's Argument

Plaintiff alleges that being denied a shower and the ability to brush his teeth or wash his hands, an inability to sleep or eat properly, the lacerations and permanent scarring he developed on his wrists and ankles from the restraints, and the fungal infections he developed on his hands and feet that resulted in bleeding and cracking skin establish a sufficiently serious medical need.  (ECF No. 64 at 18.)  Plaintiff also alleges that these conditions left him in a "semi-catatonic" state and also caused him to experience numbness and discoloration in his upper and lower extremities.  (<u>Id.</u>)  Plaintiff alleges that a reasonable doctor would find these conditions worthy of comment and that these conditions impinged on his daily activities, thereby satisfying the objective prong of this claim.  (<u>Id.</u> at 19)

Plaintiff alleges Defendants Adame and Lundy were aware of his condition because of the detectable odor about him.  (<u>Id.</u>)  Plaintiff alleges Defendant Adame was aware of his condition because he told Defendant Adame that he did not feel well, was not sleeping or eating properly, and that he wished to see a doctor.  (<u>Id.</u> at 19-20.)  Plaintiff alleges Defendant Lundy was aware of his condition because he asked Defendant Lundy to see medical personnel because he was not feeling well and had "cuts from the restraints."  (<u>Id.</u> at 20.)  Plaintiff alleges both Defendants Adame and Lundy denied Plaintiff's requests to see medical personnel, and that Defendant Adame antagonized Plaintiff for making such a request.  (<u>Id.</u>)  Plaintiff alleges that, although he made some of his requests to other prison officials, it is a fair inference that Defendant Lundy, who appeared to be in charge of Plaintiff's retention on contraband surveillance watch, was aware that Plaintiff was not receiving medical care.  (<u>Id.</u> at 20-21.)

### iv.  Analysis

The Court finds that Plaintiff has pled sufficient facts to state a cognizable Eighth Amendment denial of medical care claim.  Plaintiff's allegations of fungal infections, bleeding

and cracked skin, semi-catatonic state, permanent scarring, and numbing sensations experienced as a result of his sixteen days spent on contraband surveillance watch (ECF No. 64 at 18) sufficiently plead a serious medical need. Further, Plaintiff's allegations of an inability to practice any form of personal hygiene or to eat or sleep properly over the span of sixteen days (id.) also support this conclusion.

Moreover, although Defendants Adame and Lundy assert that they lacked the requisite awareness to be deliberately indifferent, claiming Plaintiff failed to adequately verbalize his conditions, Plaintiff alleges that Defendants Adame and Lundy were aware of the length of Plaintiff's contraband surveillance watch, witnessed the conditions Plaintiff endured on multiple occasions, heard Plaintiff's requests for medical attention and a mattress and blanket, and denied Plaintiff's requests.

Additionally, in evaluating deliberate indifference, the Court "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer v. Brennan, 511 U.S. 825, 842 (1994) (citation omitted). Drawing all inferences in Plaintiff's favor, Plaintiff's allegations that he was in a semi-catatonic state, had fungal infections, and was bleeding from wounds that left permanent scarring show that he had obviously serious medical needs (ECF No. 23 at 7.) Moreover, Defendants Adame and Lundy witnessed Plaintiff while he was suffering through these conditions and were both aware of the length and conditions of contraband surveillance watch. Accordingly, the Court finds that Plaintiff has pled sufficient facts to establish deliberate indifference on the part of Defendants Adame and Lundy.

Thus, the Court finds Plaintiff has sufficiently alleged that he had serious medical needs that were either obvious to Defendants Adame and Lundy, or that Defendants Adame and Lundy knew about because Plaintiff asked for medical care (or both), and that Defendants Adame and Lundy demonstrated deliberate indifference to those needs.

///

///

///

### d. First Amendment Retaliation Claims

#### i. Legal Standard for First Amendment Retaliation

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so." <u>Watison v. Carter</u>, 668 F.3d 1108, 1114 (9th Cir. 2012). In order to establish a retaliation claim, a plaintiff must allege the following: (1) he engaged in conduct that is protected (e.g. filing an inmate grievance); (2) "the defendant took adverse action against the plaintiff;" (3) "a causal connection between the adverse action and the protected conduct," which can be inferred from the chronology of events; (4) the defendant's conduct would "chill or silence" a reasonable person's First Amendment activities; and (5) the defendant's conduct was not in furtherance of the legitimate aim of the correctional institution. <u>Id.</u> at 1114-15.

#### ii. Summary of Defendants' Argument

Defendants argue that Plaintiff fails to establish a First Amendment retaliation claim, particularly with respect to the causation element of the claim. (ECF No. 59 at 22.) Defendants argue that, although Plaintiff engaged in protected conduct in filing his grievances against Institutional Gang Investigation staff at Centinela, Plaintiff's allegations fail to show that it was protected conduct that led to Plaintiff being placed on contraband surveillance watch. (<u>Id.</u>) Defendants argue that the significant temporal distance of six months between Plaintiff's grievance filings and his initial interactions with Defendant Adame support that there is no causal connection between those filings and the Defendants' actions in relation to Plaintiff. (<u>Id.</u>)

Defendants argue that, chronology aside, Plaintiff's allegations do not imply that Defendant Adame assigned Plaintiff to contraband surveillance watch because of Plaintiff's prior filing of grievances. (<u>Id.</u>) Defendants argue that Defendant Adame did not state that Plaintiff must refrain from filing grievances or that Plaintiff's placement on contraband surveillance watch was related to Plaintiff's prior filings. (<u>Id.</u> at 23.) Defendants also argue that Plaintiff failed to establish that Defendants Tyree and Lundy did anything more than speak to Plaintiff while Plaintiff was on contraband surveillance watch and tell Plaintiff that he would

be released if he cooperated.  (Id.)  Defendants argue that Plaintiff has failed to allege that Defendants Tyree and Lundy made any suggestion to Plaintiff that he was on contraband surveillance watch because of his prior grievance filings.  (Id. at 23-24.)

### iii.   Summary of Plaintiff's Argument

Plaintiff alleges that he engaged in protected conduct in filing multiple grievances challenging his gang validation.  (ECF No. 64 at 21.)  Plaintiff alleges he also filed grievances, alleging that members of the Institutional Gang Investigation staff fabricated evidence used to validate him, and organized other prisoners to do the same.  (Id.)  Plaintiff alleges he wrote a letter to the Warden of Centinela urging him to investigate Plaintiff's allegations, which the Warden agreed to do.  (Id.)  Plaintiff alleges that Defendant Adame "incessantly harass[ed]" Plaintiff regarding Plaintiff's grievance filings and organization of other prisoners to do the same.  (Id. at 23.)

Plaintiff alleges that the comments made to him by Defendants demonstrate a retaliatory motive.  Plaintiff alleges Defendant Adame told Plaintiff during their first encounter that grievances in the new institution where Plaintiff was to be held were used as "toilet tissue" and that filing such grievances about Plaintiff's treatment would be futile.  (Id.)  Plaintiff alleges that, after making the aforementioned comments to Plaintiff, Defendant Adame put him on contraband surveillance watch with no mattress or blanket or access to personal hygiene.  (Id.) Plaintiff alleges Defendant Adame also forced Plaintiff to wear unsanitary mittens and directed others to have Plaintiff defecate in a humiliating manner.  (Id. at 23-24.)  Plaintiff also alleges that the mere sixteen days in between Plaintiff's last grievance filing and his first encounter with Defendant Adame further indicate a causal connection between Plaintiff's protected speech and Defendant Adame's adverse action against Plaintiff in placing Plaintiff on contraband surveillance watch.  (Id. at 25.)

Plaintiff alleges Defendants Tyree and Lundy had a conversation in his presence in which Defendant Lundy smirked and told Plaintiff that if he wanted a blanket and to be able to wash himself then he should file a grievance and "complain like he usually does."  (Id. at 24.) Plaintiff alleges Defendant Tyree replied that Plaintiff has the option of filing a grievance, but

that Defendant Tyree was "not sure how far [Plaintiff] will get with that hand tied up though." (Id.)

Plaintiff alleges that Defendant Lundy, in spite of seeing that Plaintiff did not have a mattress or blanket and witnessing Plaintiff's apparent foul odor, did not respond to Plaintiff's requests for a mattress or blanket, to see medical staff, or to be released from contraband surveillance watch. (Id. at 26.) Additionally, at the Institutional Classification Committee Meeting, Defendant Lundy responded to Plaintiff's questions as to why Plaintiff was on contraband surveillance watch in the first place, why Plaintiff was still on contraband surveillance watch after providing four clean bowel movements and a clean x-ray, and why Plaintiff could not see medical staff despite his complaints of cuts from his restraints and not feeling well by stating that Plaintiff needed to provide one more clean bowel movement and x-ray before Plaintiff would be released. (Id.) Defendant Lundy did not respond to Plaintiff's questions regarding his denial of medical care and the reasoning behind Plaintiff's retention on contraband surveillance watch. (Id.)

Plaintiff claims Defendant Tyree urged Plaintiff to become an informant and threatened to put Plaintiff on single cell status, which would indicate that Plaintiff was acting as a confidential informant and put Plaintiff in danger. (Id.) Plaintiff also alleges Defendant Tyree continued to deny him the ability to wash the hand Plaintiff was permitted to eat with. (Id. at 27.)

iv. <u>Analysis</u>

Construing all facts in favor of the Plaintiff, the Court finds Plaintiff has pled adequate facts to support his First Amendment retaliation claims. It is undisputed that Plaintiff has engaged in conduct protected by the First Amendment (filing grievances), satisfying the first element of the retaliation test.

Second, Plaintiff has sufficiently alleged that Defendants did take adverse action against him. Plaintiff alleges Defendants placed him on contraband surveillance watch under conditions that were deplorable and harsher than what protocol called for. Plaintiff also alleges that he was kept on contraband surveillance watch for sixteen days, which was longer than

protocol called for.  Plaintiff further alleges that Defendants refused to respond to Plaintiff's requests for washing, bedding, and medical attention.  As a result of these conditions, Plaintiff alleges he was in a catatonic state and was left with infections and permanent scarring.

The Court finds Plaintiff has also pled sufficient facts to satisfy the causation element of his retaliation claims.  Although there is some temporal distance between Plaintiff's first engagement in protected conduct and his placement and retention on contraband surveillance watch, his last grievance was filed just sixteen days before he first encountered Defendant Adame, who placed him on contraband surveillance watch after allegedly harassing him about his grievances.  Plaintiff also alleges that Defendant Adame stated that grievances at CCI were used as "toilet tissue" and that filing such grievances about Plaintiff's treatment would be futile.  Plaintiff also alleges that Defendant Lundy smirked and told Plaintiff that if he wanted a blanket and to be able to wash himself then he should file a grievance and "complain like he usually does."  Finally, Plaintiff alleges that Defendant Tyree replied that Plaintiff has the option of filing a grievance, but that Defendant Tyree was "not sure how far [Plaintiff] will get with that hand tied up though."  Thus, these statements appear to show that Defendants knew of Plaintiff's history of filing grievances, and demonstrate retaliatory conduct on the part of Defendants in response to Plaintiff's filing of grievances.  Because causation can be either directly established or indirectly inferred from the circumstances, the Court finds that Defendants' alleged statements, in conjunction with the closeness in time between the last grievance filed by Plaintiff and his placement on contraband surveillance watch, are sufficient to infer and establish causation here.

The fourth element of a retaliation claim, that a reasonable person's First Amendment activities would be chilled due to the defendant's conduct, is also sufficiently pled here.  Because this element is guided by a reasonable person standard, and "'since harm that is more than minimal will almost always have a chilling effect[, a]lleging harm *and* alleging the chilling effect would seem under the circumstances to be no more than a nicety,'" Brodheim v. Cry, 584 F.3d 1262, 1270 (9th Cir. 2009) (quoting Rhodes v. Robinson, 408 F.3d 559, 568, n.11 (9th Cir. 2005)) (emphasis in the original), this element is presumed to be satisfied here.

Finally, although Defendants argue that there was a legitimate correctional institution interest in subjecting Plaintiff to contraband surveillance watch because they believed Plaintiff had contraband, in taking Plaintiff's allegations as true and construing them in Plaintiff's favor, and in considering the alleged conditions Plaintiff endured while on contraband surveillance watch, the Court finds that Plaintiff has sufficiently pled that he was placed on contraband surveillance watch for engaging in protected conduct, not because it was believed he had contraband. Accordingly, Plaintiff's retaliation claims survive this motion to dismiss.

### e. Qualified Immunity

#### i. Legal Standard for Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. Al–Kidd, 563 U.S. 731, 735 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To be clearly established, a right must be sufficiently clear "that every 'reasonable official would [have understood] that what he is doing violates that right.'" Reichle v. Howards, 132 S. Ct. 2088, 2090 (2012) (quoting Al–Kidd, 563 U.S. at 741) (alteration in original). This immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

"Since qualified immunity is a defense, the burden of pleading it rests with the defendant." See Fed. Rule Civ. Proc. 8(c) (defendant must plead any 'matter constituting an avoidance or affirmative defense'); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1271 (1969). "It is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful. We see no basis for imposing on the plaintiff an obligation to anticipate such a defense by stating in his complaint that the defendant acted in bad faith." Gomez v. Toledo, 446 U.S. 635, 640 (1980).

#### ii. Summary of Argument

Defendants argue that they are entitled to qualified immunity from Plaintiff's Eighth Amendment conditions of confinement claims regarding Plaintiff's placement and maintenance

on contraband surveillance watch. (ECF No. 59 at 25.) Defendants allege that qualified immunity applies because placing and maintaining Plaintiff on contraband surveillance watch under the conditions Plaintiff describes was not a clearly established infringement of Plaintiff's Eighth Amendment rights at the time of the incident. (Id.) Defendants assert that they were not aware that these conditions—which were in alignment with contraband surveillance watch protocol—were unconstitutional. (Id.)

Plaintiff argues that Defendants are not entitled to qualified immunity, because it was clearly established at the time of Plaintiff's confinement that denying a prisoner the basic necessities of life, such as clothing, nutrition, medical care, sanitation, was unconstitutional, and these were the conditions Plaintiff was subjected to. (ECF No. 64 at 28.)

iii.  Analysis

As analyzed above, based on Plaintiff's allegations, Defendants did not follow contraband surveillance watch protocol. Additionally, based on the foregoing allegations and based on the conditions of confinement analysis above, the Court finds that Plaintiff has sufficiently alleged conditions (e.g., placing an inmate in freezing conditions without a blanket or jacket and depriving the inmate of adequate sleep, sanitation, and medical care for such a prolonged period of time) that every reasonable official would realize would be unconstitutional. See, e.g., Wilson v. Seiter, 501 U.S. 294, 304 (1991) ("Some conditions of confinement may establish an Eighth Amendment violation 'in combination'… for example, a low cell temperature at night combined with a failure to issue blankets."); Hignite v. Felker, 2008 U.S. Dist. LEXIS 111532, at *18 (E.D. Cal. July 11, 2008), findings and recommendation adopted by 2008 U.S. Dist. LEXIS 79192 (E.D. Cal. Aug. 21, 2008) (plaintiff's allegations that "he was placed on contraband watch in an unauthorized fashion for an excessive 84 hours, was denied a mattress for much of that time without running water, was forced to eat his food with his bare hands, was denied basic hygiene and adequate water and was restrained by multiple layers of tape, waist chains, handcuffs and leg restraints…" supported the denial of a motion to dismiss).

Thus, the Court finds that, at this stage in the proceedings, Defendants are not entitled to

qualified immunity. However, the Court notes that this finding is based solely on construing the facts alleged as true and in favor of Plaintiff, which the Court must at this stage in litigation. This finding is without prejudice to Defendants asserting this defense at a later stage in the proceeding.

### f. Legal Standards for Injunctive Relief, Declaratory Relief, and Eleventh Amendment Immunity

"[I]njunctive relief is appropriate only when 'irreparable injury' is threatened," Gomez v. Vernon, 255 F.3d 1118, 1129 (9th Cir. 2001) (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983)), and other legal remedies are inadequate, Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982). In order to obtain injunctive or declaratory relief, "a plaintiff must show that he has suffered or is threatened with a 'concrete and particularized' legal harm, coupled with 'a sufficient likelihood that he will again be wronged in a similar way.'" Canatella v. State of California, 304 F.3d 843, 852 (9th Cir. 2002) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), then quoting Lyons, 461 U.S. at 111).

"The Eleventh Amendment bars suits for money damages in federal court against a state, its agencies, and state officials in their official capacities." Aholelei v. Dept. of Public Safety, 488 F.3d 1144, 1147 (9th Cir. 2007) (citations omitted). However, the Eleventh Amendment does not bar suits seeking damages against state officials in their personal capacities. Hafer v. Melo, 502 U.S. 21, 30 (1991); Porter v. Jones, 319 F.3d 483, 491 (9th Cir. 2003). Additionally, the Eleventh Amendment does not bar suits for prospective declaratory or injunctive relief against state officials in their official capacities. Ex Parte Young, 209 U.S. 123, 155-56 (1908); Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 n.10 (1989); Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985); Flint v. Dennison, 488 F.3d 816, 825 (9th Cir. 2007).

### i. Summary of Arguments

As part of his requested relief, Plaintiff seeks prospective injunctive relief against, "harassment, retaliation or reprisals" from "defendants, their agents, and successors." (ECF No. 23 at 17.) Plaintiff alleges that he is not safe from retaliation by members of IGIU or by

Defendants Adame, Lundy, and Tyree even though he is now detained at Kern Valley State Prison ("KVSP"). (Id.) Defendants argue that Plaintiff is not entitled to prospective injunctive relief because Plaintiff has been transferred to another prison and because Plaintiff has failed to establish First Amendment retaliation claims.

Plaintiff also seeks "[a] declaratory judgment that defendants and/or omission described herein violation [Plaintiff's] rights as herein stated." (Id.) Defendants do not contest Plaintiff's ability to sue for declaratory relief.

### ii. Analysis of Defendants' Claim of Eleventh Amendment Immunity

As discussed above, the Court finds Plaintiff has pled sufficient facts to establish First Amendment retaliation claims against Defendants. As a result, the Court finds that Plaintiff has sufficiently pled a "concrete and particularized" harm. However, it is undisputed that Plaintiff has been transferred and is now detained at KVSP, and it appears as though Defendants work at CCI (ECF No. 23 at 3.) Additionally, Plaintiff has failed to allege any facts suggesting that Defendants will harm him again.

Accordingly, the Court finds that Plaintiff has failed to allege sufficient facts to establish that he will "again be wronged in a similar way" or that there is a threatened "irreparable injury," and the Court therefore recommends that Plaintiff's requests for injunctive relief and declaratory relief be dismissed.

As the Court is recommending that Plaintiff's requests for injunctive relief and declaratory relief be dismissed, and as Plaintiff's remaining requests for relief are only for monetary damages, the Court will also recommend dismissing Defendants from this case in their official capacities.

However, the Court will also recommend that these dismissals be without prejudice to Plaintiff amending his complaint to request injunctive relief in the future should he need to do so.

### V. CONCLUSION

Accordingly, based on the foregoing, IT IS HEREBY RECOMMENDED that:

    1. Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN

PART;

2. This case proceed on Plaintiff's claims for Eighth Amendment Conditions of Confinement, Eighth Amendment Denial of Medical Care, and First Amendment Retaliation.

3. Plaintiff's requests for declaratory and injunctive relief is DISMISSED; and

4. This case proceed against Defendants only in their individual capacities.

These findings and recommendations will be submitted to the United States district court judge assigned to this action pursuant to the provisions of 28 U.S.C. § 636 (b)(1). Within **twenty-one (21) days** after being served with a copy of these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within **seven (7) days** after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (quoting Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __**June 22, 2018**__              ___/s/ Erica P. Grosjean___

UNITED STATES MAGISTRATE JUDGE